United States District Court
for the
Southern District of Florida

| | |
|---|---|
| United States of America, Plaintiff | ) ) ) |
| v. | ) )  Criminal Case No. 23-20330-CR-Scola ) |
| Emilio Amado Vrdoljak, Defendant. | ) ) ) |

## Order Denying Motion to Suppress

The Defendant Emilio Amado Vrdoljak asks the Court to suppress evidence obtained as a result of a border search of his cell phone at the Miami International Airport. (Mot. to Suppress, ECF No. 28.) The Government opposes the motion, arguing that the child pornography images discovered on Mr. Vrdoljak's cell phone were found as the result of a legal search at the border. (Govt.'s Resp., ECF No. 35.) Mr. Vrdoljak filed a reply in support of the motion. (Reply, ECF No. 39.) In addition, on November 20, 2023, the Court held an evidentiary hearing on Mr. Vrdoljak's motion. After careful review of the parties' briefing, the record, the evidence and arguments presented at the hearing, and the relevant legal authorities, the Court **denies** Mr. Vrdoljak's motion. (**ECF No. 28**.)

1. **Summary of Testimony**

**A. CBP Officer Ehtesham Khan**

Ehtesham Khan has been a U.S. Customs and Border Protection ("CBP") officer since December 2008. As a CBP Officer, he has served in various roles. Most recently, he has been working at the secondary immigration inspection area at Miami International Airport.

Officer Khan is familiar with the investigation into Mr. Vrdoljak. He was working at the secondary inspection area on June 29, 2023, when an Argentinian male minor with whom Mr. Vrdoljak had been travelling ("Minor 1") was led there following his primary inspection by another CBP officer. The CBP officer who had conducted Minor 1's primary inspection had found Minor 1's explanation that he was traveling to the United States to stay with his English teacher and with no other students to be suspicious.

Upon reviewing the referral that had been prepared by the primary inspection CBP Officer, Officer Khan asked Minor 1 to approach his cubicle, took

Minor 1's passport, and searched his name in the system. Officer Khan then began asking Minor 1 questions about the purpose of his visit to the United States. Minor 1 explained that he was planning to vacation for two weeks with his English teacher. When Officer Khan asked where his English teacher was, Mr. Vrdoljak, who had independently made his way to the secondary inspection area, approached Officer Khan's cubicle and interjected that he was the English teacher.

Officer Khan asked for Mr. Vrdoljak's passport as well, and learned that, unlike Minor 1, he had used the Global Entry trusted traveler program to enter the United States. Officer Khan found it suspicious that Mr. Vrdoljak and Minor 1 had attempted to pass through immigration separately. He explained that, while it is not unusual for students to travel to the United States with their teachers for educational trips, they almost always do so in large groups, and at least one teacher always remains with the student during the immigration process in case there are any mishaps. Here, however, Mr. Vrdoljak and Minor 1 were travelling alone, and had attempted to go through immigration separately.

Officer Khan continued questioning Minor 1 and learned that Mr. Vrdoljak was friends with Minor 1's mother. Minor 1 confirmed that he had known Mr. Vrdoljak for a very long time and that the latter was taking him for a vacation. Officer Khan knew that students travelling with their teachers often carried permission letters from their parents, but he did not ask Minor 1 whether he had such a letter. It was later learned that Minor 1 did have such a letter.

Even though Officer Khan was aware that his supervisor, CBP Officer Francisco Pages, had attempted to contact Minor 1's mother to confirm his story, neither officer touched base with the other during this initial period of the investigation. So, Officer Khan did not learn that Officer Pages indeed was able to talk with Minor 1's mother and confirmed that Minor 1 had permission to travel with Mr. Vrdoljak as his English teacher.

Around that time, Officer Khan asked both Minor 1 and Mr. Vrdoljak for their phones and corresponding passwords, explaining that he had border search authority. Both Minor 1 and Mr. Vrdoljak voluntarily handed over their phones and passwords to Officer Khan. Officer Khan conducted a basic, manual inspection of Minor 1 and Mr. Vrdoljak's respective phones. Upon doing this, he discovered that both phones contained a conversation between Minor 1 and Mr. Vrdoljak that was sexual in nature, though Officer Khan does not remember the precise content of the exchange. But, the conversation had been partly deleted from Mr. Vrdoljak's phone. Officer Khan was thrown off by the conversation and thought perhaps Mr. Vrdoljak was grooming Minor 1 to engage in other sexual conduct or that Minor 1 was a victim of human trafficking. Officer Khan explained that in his experience cellphones can contain prohibited contraband

just like any other personal item, and he felt compelled to contact his supervisor to let him know what had been discovered on the phones.

### B. HSI Special Agent Matthew Couch

Matthew Couch is a special agent with Homeland Security Investigations ("HSI"), within the United States Department of Homeland Security ("DHS"). Agent Couch has worked for DHS for over twenty years in various roles and currently works in the child exploitation group.

Agent Couch has knowledge of the investigation into Mr. Vrdoljak that began on June 29, 2023. On that day, his office received a call from CBP Officer Pages asking him to respond to the situation that had arisen with Mr. Vrdoljak and Minor 1 at Miami International Airport. Officer Pages explained on the call that they had found two conversations that were sexual in nature on Mr. Vrdoljak's cell phone: one with Minor 1 and another with another person who was sixteen years old ("Minor 2"). Agent Couch immediately travelled to the secondary inspection area at Miami International Airport.

Once at the secondary inspection area, the first thing Agent Couch did was to conduct a manual inspection of Mr. Vrdoljak and Minor 1's phones. He confirmed that the conversation between Mr. Vrdoljak and Minor 1 was sexual in nature, including the sharing of sexually explicit videos and suggestive discussions of male body parts, among other things. Agent Couch also saw that the conversation with Minor 2 was sexually explicit, including, for example, Mr. Vrdoljak sharing pornographic material with, and requesting it from, Minor 2.

Agent Couch then interviewed Minor 1. Minor 1 said that Mr. Vrdoljak had shown him pornographic materials on more than one occasion and had touched him inappropriately while they were on the airplane.

Agent Couch also conducted a recorded interview of Mr. Vrdoljak, who was provided his Miranda rights in Spanish and waived them in writing. Mr. Vrdoljak acknowledged that he had shown Minor 1 pornographic material but disputed the number of times he had done so. He also ultimately acknowledged that he had had the sexually explicit conversation reflected in his phone with Minor 1. Mr. Vrdoljak also acknowledged that he had had the sexually explicit conversation reflected in his phone with Minor 2, that he knew Minor 2 was, indeed, a Minor, and that it was inappropriate for him to have continued the conversation after learning that fact.

At this point, Agent Couch grew concerned over Minor 1's safety, so he contacted the United States Attorney's Office in the Southern District of Florida, gave them the information he had acquired to that point, and proceed from there. In addition, he took Mr. Vrdoljak's phone back to the Miami HSI office, where he gave it the next day to a forensic agent to conduct a forensic

examination for the first time. The forensic agent conducted a full extraction of the phone, which revealed, among other things, the full conversation between Mr. Vrdoljak and Minor 1.

Agent Couch also remembers learning at some point that a phone call was made by CBP Offer Pages to Minor 1's mother, who confirmed that her son was travelling with Mr. Vrdoljak as his English teacher, that she had known Mr. Vrdoljak all her life, and that Minor 1 had known him for a long time as well. During the conversation with Officer Pages, Minor 1's mother apparently also confirmed that she had provided a letter to her son allowing him to travel, though Agent Couch never saw the letter himself and does not recall the specific content of the letter, including whether it mentioned Mr. Vrdoljak specifically or where Minor 1 was travelling to. Agent Couch also testified that he believes Minor 1 had a visa to legally enter the United States, but Agent Couch never checked, and does not know, whether Minor 1 had a previously purchased, return ticket to Argentina upon arriving in Miami.

2. **Findings of Fact**

After considering the credible evidence and testimony, the Court makes the following findings of fact. On June 29, 2023, Mr. Vrdoljak and Minor 1 arrived in Miami International Airport from Argentina. When Minor 1 was questioned at the airport's primary immigration inspection site, his explanation that he was travelling to the United States to spend time alone with his English teacher produced suspicion in the primary inspection CBP Officer, who then led Minor 1 to the airport's secondary inspection area.

Upon learning that Minor 1 had been moved to the secondary inspection area, Mr. Vrdoljak, who had passed through immigration independently of Minor 1 by using the Global Entry program, voluntarily turned back and joined Minor 1 in the secondary inspection area. There, CBP Officer Khan began questioning Minor 1, and learned the same narrative about how he was travelling along with his English teacher. Officer Khan asked where the English teacher was, and it was then that Mr. Vrdoljak interjected himself into the conversation and presented himself as the English teacher. Officer Khan was suspicions at this point, as, in his experience, students traveling with their teachers always travelled in large groups and went through the immigration check process together.

Officer Khan then asked Mr. Vrdoljak and Minor 1 to check their cell phones, and both voluntarily provided their phones as well as their passwords. Upon conducting a basic search of the cellphones, Officer Khan discovered a chat between Mr. Vrdoljak and Minor 1 that was sexual in nature. The chat led Officer Khan to believe that Mr. Vrdoljak was either grooming Minor 1 to engage

in sexual conduct or that Minor 1 was a victim of human trafficking. At this point Officer Khan contacted his supervisor, CBP Officer Pages, who conducted his own review of the cell phones and discovered a sexually explicit chat with another apparent minor, Minor 2.

Officer Pages eventually contacted the Miami HSI office and asked Special Agent Matthew Couch to come to the secondary inspection area at Miami International Airport to address the situation. Agent Couch arrived at the secondary inspection area that same day. Agent Couch conducted his own manual search of Mr. Vrdoljak and Minor 1's cell phones and was able to confirm that Mr. Vrdoljak's phone contained chats of a sexual nature with both Minor 1 and Minor 2. Among other things, Agent Couch saw that in the conversation with Minor 2 Mr. Vrdoljak requested pornographic material from Minor 2.  Agent Couch also interviewed Mr. Vrdoljak. Mr. Vrdoljak acknowledged that he had had the sexually explicit conversations reflected in his phone with Minor 1 and Minor 2.

It was only after this point that Agent Couch took Mr. Vrdoljak's phone back to the Miami HSI office, where a forensic agent conducted a full extraction of the phone the next day.

### 3. Discussion

"Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing . . . reasonableness generally requires the obtaining of a judicial warrant." *Veronia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). Where no warrant is obtained, a search is reasonable only if it falls within a specific exception to the Fourth Amendment's warrant requirement. *Riley v. California*, 134 S. Ct. 2473, 2482 (2014). Border searches are one of these exceptions. It has long been held that "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616 (1977). To be sure, "the Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Florez-Montano*, 541 U.S. 149, 152 (2004). This particular exception to the warrant requirement is quite broad and routine border stops and searches of people, their luggage, personal effects, and vehicles may be conducted without any probable cause or reasonable suspicion. Moreover, in the Eleventh Circuit, "no suspicion is necessary to search electronic devices at the border." *United States v. Touset*, 890 F.3d 1227, 1229 (11th Cir. 2018).

Mr. Vrdoljak requests that the Court suppress the evidence seized during

the border search of his cell phone at Miami International Airport as well as his recorded statement to Couch. He does not contest the voluntariness of the statement, only that it was fruit of the poisonous tree. He argues that the search conducted by the CBP officers shortly after he was detained was an intrusive, thorough, search for which reasonable suspicion was required, and that, therefore, all evidence obtained as a result of the search must be suppressed as being fruit of the poisonous tree.[1] Mr. Vrdoljak's contention fails in two key respects. First, Mr. Vrdoljak fails to convince the Court that the initial search of his cellphone by the CBP officers amounted to anything other than a routine search. Second, even if Mr. Vrdoljak was correct that CBP's search was nonroutine, the Eleventh Circuit has clearly held that no suspicion is required at the border even for more intrusive searches of electronic devices.

It is undisputed that the initial searches of Mr. Vrdoljak's cellphone at Miami International Airport were nothing more than "manual," or basic, searches of the device. When CBP Officer Ehtesham Khan requested to search Mr. Vrdoljak's cellphone, Mr. Vrdoljak cooperated by providing the password to access the cellphone. With the phone unlocked, Officer Khan was able to do a simple, superficial search of the phone that revealed a WhatsApp chat between Mr. Vrdoljak and Minor 1 that was sexual in nature. At that point Officer Khan contacted his supervisor, Officer Pages, who conducted his own manual search of the phone. Officer Pages's search revealed another WhatsApp chat between the Defendant and Minor 2 that contained suspected child pornography. Neither Officer Khan nor Officer Pages used any sort of external equipment to either access or search through the phone. Agent Matthew Couch, too, conducted a basic, manual review of the phone.

Throughout his motion, Mr. Vrdoljak takes the position that the officers' search of his cell phone was a nonroutine search, even stating at one point that it "in reality was a 'computer strip search[.]'" (Mot. to Suppress 9, ECF No. 28.) As Mr. Vrdoljak's motion implicitly acknowledges, even the courts that, unlike the Eleventh Circuit, require reasonable suspicion for certain searches of electronic devices at the border distinguish between basic and the more intrusive, forensic, searches of those devices. *See United States v. Cano*, 934 F.3d 1002, 1016 (9th Cir. 2019) ("[B]order officials may conduct suspicionless manual searches of cell phones, but must have reasonable suspicion before they conduct a forensic search[.]"); *United States v. Kolsuz*, 890 F.3d 133, 146-47 (4th Cir. 2018) ("[A] forensic search of a digital phone must be treated as a

---

[1] Mr. Vrdoljak also briefly makes a note about whether the search here was authorized by statue. However, because Mr. Vrdoljak does not develop this point further, and therefore the nature of the argument is unclear, the Court will refrain from addressing it.

nonroutine border search, requiring some form of individualized suspicion."). However, Mr. Vrdoljak fails to provide any factual or legal support for the position that the officers' search of his cell phone was anything other than a basic search.

Indeed, although the authority on this issue is limited, the consensus seems to be that simply scrolling through an individual's phone, like the officers did here, without the assistance of any sort of external device, is nothing more than a routine search. *See United States v. Cotterman*, 709 F.3d 952, 960-61, 966, 967 (9th Cir. 2013) (holding that manual search of files on a laptop computer — "a quick look and unintrusive search" — is reasonable "even without particularized suspicion"); *United States v. Ickes*, 393 F.3d 501, 507 (4th Cir. 2005) (treating manual, on-site inspection of computer contents that would be accessible to any user as routine a border inspection, which did not require individualized suspicion).[2] And there is no dispute that by the time Agent Couch took Mr. Vrdoljak's phone back to the Miami HSI office for the forensic examination there was more than enough basis for reasonable suspicion.

Regardless, even if Mr. Vrdoljak had adequately argued that the CBP officers' search of his cell phone was an intrusive, nonroutine search, "in the Eleventh Circuit, border searches require *no suspicion* at all." *United States v. Haynes*, No. 19-80045-CR, 2020 U.S. Dist. LEXIS 3426, at *2, 2020 WL 109061, at *1 (S.D. Fla. Jan. 8, 2020) (Altman, J.) (emphasis in original) (citing *United States v. Touset*, 890 F.3d 1227, 1233 (11th Cir. 2018)). In *Touset*, the Eleventh Circuit unequivocally held that "the Fourth Amendment does not require any suspicion for forensic searches of electronic devices at the border." 890 F.3d 1227, 1231 (11th Cir. 2018). And the Eleventh Circuit recently reaffirmed this holding in *United States v. Fonseca*. *See* No. 22-13152, 2023 U.S. App. LEXIS 29217, at *6 (11th Cir. Nov. 3, 2023) (citing *Touset* in noting that the defendant "correctly admit[ed] that his first argument for suppression—that forensic searches of cellphones at the border still require individualized reasonable suspicion—is foreclosed by this Circuit's precedent").

Perhaps noting its significance, Mr. Vrdoljak attempts to distinguish *Touset* by arguing that the CBP officers in that case had reasonable suspicion to search the defendant's cell phone. (Mot. to Suppress 10–11, ECF No. 28.) However, as the Government correctly points out, the *Touset* court made a point

---

[2] *See also* CBP Directive No. 3340-049A, Border Search of Electronic Devices (2018), *available at* https://www.cbp.gov/sites/default/files/assets/documents/2018-Jan/CBP-Directive-3340-049A-Border-Search-of-Electronic-Media-Compliant.pdf (last accessed Nov. 17, 2023) (distinguishing between "basic" and "advanced" searches, and defining an "advanced search" as "any search in which an Officer connects external equipment, through a wired or wireless connection, to an electronic device not merely to gain access to the device, but to review, copy, and/or analyze its contents").

of holding that reasonable suspicion existed in that case only "*in the alternative*[.]" 890 F.3d at 1237 (emphasis added). In fact, *Touset* goes on to discuss the existence of reasonable suspicion only after a lengthy discussion of why the Fourth Amendment permits forensic searches of electronic devices at the border without such suspicion. Accordingly, under binding Circuit precedent, the Court must deny Mr. Vrdoljak's motion in any case.

### 4. Conclusion

The Court has considered the parties' briefing on Mr. Vrdoljak's motion to suppress. (ECF No. 28.) The Court also held an evidentiary hearing, as well as heard oral argument from the parties. The Court finds (1) the search of Mr. Vrdoljak's cellphone at Miami International Airport was part of a routine border search and (2) even if it amounted to a more intrusive search, under binding Eleven Circuit precedent, no reasonable suspicion was necessary. Accordingly, the Court **denies** Mr. Vrdoljak's motion to suppress (**ECF No. 28**.).

**Done and Ordered** in Chambers at Miami, Florida, on November 20, 2023.

_____
Robert N. Scola, Jr.
United States District Judge